[Cite as *In re S.S.*, 2017-Ohio-4474.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

In re S.S., T.H., R.S., M.H.,
Z.M., M.N., Ar.B., Ak.B.

Court of Appeals Nos. L-16-1234
L-16-1243

Trial Court No. JC 15251270

**DECISION AND JUDGMENT**

Decided: June 23, 2017

* * * * *

Laurel A. Kendall, for appellants.

Jeremy Young, for appellee.

* * * * *

**SINGER, J.**

**{¶ 1}** This is a consolidated appeal from a judgment of the Lucas County Court of

Common Pleas, Juvenile Division, which terminated the parental rights of appellant,

V.H., to five of her children and granted permanent custody of those children to appellee,

Lucas County Children Services. One of appellant's children, child 5, also appealed the

court's judgment as it relates to him. For the reasons that follow, we affirm the court's

judgment.

**{¶ 2}** Appellant sets forth two assignments of error:

I. The Trial Court's finding that the children could not be returned to Appellant within a reasonable time was not supported by clear and convincing evidence.

II. Lucas County Children Services failed to provide reasonable efforts to reunify the family.

{¶ 3} Child 5 did not specifically delineate an assignment of error on appeal. He did, however, set forth the following issues:

Did Lucas County Children Services make reasonable efforts to reunify the family here, when no services were provided to mother, yet some of her children were returned to her custody while custody of others were awarded to LCCS; and did the court err by awarding custody of a middle child to LCCS when he had expressed a clear preference for being placed with his older siblings in the custody of his mother; and if so, does the minor child have standing to appeal his custody to the agency.

## Background

{¶ 4} Appellant is the biological mother of nine children, eight of whom were the subject of the permanent custody proceeding in the Lucas County Court of Common Pleas, Juvenile Division. Appellant's children, identified by number in the birth order, are: child 1 (born in April 1996), child 2 (born in April 2000), child 3 (born in December 2001), child 4 (born in February 2003), child 5 (born in August 2006), child 6 (born in

2.

August 2007), child 7 (born in April 2011), child 8 (born in July 2012), and child 9 (born in May 2014).

{¶ 5} The biological father of child 1, 2 and 4 was S., who committed suicide in 2003. K.S. is the biological father of child 3. W.G. is the biological father of child 5. F.M. is the biological father of child 6. M.N. is the biological father of child 7. Lastly, A.B. is the biological father of child 8 and 9. None of the fathers are parties to this appeal. In addition, child 1 is not involved in this appeal.

{¶ 6} The record reflects appellant has had involvement with appellee for years. Appellant was in foster care when she was about seven years old until she was about nine years old. Then, when appellant was 12 years old, she gave birth to child 1. Nine months later, appellant was placed in foster care with child 1. A year and one-half after that, child 1 was removed from appellant's care and found to be dependent and neglected. Appellant became pregnant again, but miscarried. Ultimately appellant's parental rights to child 1 were terminated. At age 17, appellant gave birth to child 2. Appellee took custody of child 2 when she was discharged from the hospital, and when she was four months old, appellee awarded custody to appellant's cousin. A year and one-half later, appellant was awarded custody of child 2. Over the next 13 years, appellant had seven more children.

{¶ 7} With respect to the 2014 case, appellee became involved with the family in July 2014, when it received a referral regarding child 9, who was seven weeks old. Child 9 had been taken to the hospital by appellant, on July 2, 2014, where he was diagnosed

3.

with failure to thrive for failing to gain the appropriate amount of weight, and multiple, non-accidental fractures, in various stages of healing, including rib fractures, clavicle fractures and fractures of both humeri. Child 9 was admitted to the hospital where he was treated for two days. It was unknown who inflicted the injuries to child 9. Appellee removed the seven children who lived at the home, and placed the children with the H. family. Child 2 was not living at appellant's home, as appellant sent child 2 to Alabama to live with her paternal grandmother in August 2013, because child 2 was acting out, running away and not taking her medications. Child 2 returned to Toledo in February 2015.

{¶ 8} With respect to the 2015 case, the children, except child 2, lived with the H. family until October 2015, when appellee discovered the conditions in the H. family home were unsatisfactory and many of the children's medical appointments had been missed. The children were removed from the H. family home and placed in foster homes. On November 4, 2015, appellee filed an original complaint for permanent custody. An amended complaint was filed on June 2, 2016.

{¶ 9} An adjudication hearing was held on June 15 and 16, 2016, and a disposition hearing held on July 19, 27 and 28, 2016. Appellant and A.B. attended the hearings and testified. The trial court found the youngest seven children were dependent and neglected, and child 2 was dependent. The court further found the five youngest children could not be placed with either parent within a reasonable time and it was in the children's best interest to grant permanent custody of them to appellee. The court further

4.

found it was in the best interest of child 2, 3 and 4 to be returned to appellant and A.B, under appellee's protective supervision. On October 17, 2016, the court filed its judgment entry. Appellant and child 5 timely appealed. A.B. also appealed, but his appeal was untimely, and dismissed.

## The Hearings

{¶ 10} Appellee called numerous witnesses at the adjudication and disposition hearings, including caseworkers, the guardian ad litem ("GAL") and a medical child abuse expert. Appellant testified and called several witnesses to testify. Child 2, 3 and 4 also testified. The testimony relevant to the appeal is summarized below.

**Caseworker Rebecca Von Sacken**

{¶ 11} Von Sacken, an assessment caseworker for appellee, testified she received a referral on July 2, 2014, with respect to child 9 and the unexplained fractures that he suffered and failure to thrive. As a result of the referral, appellee removed appellant's seven youngest children from the home and placed them with the H. family. Von Sacken stated the failure to thrive diagnosis was based on child 9 having gained only 10 ounces since his birth, but during 24 hours in the hospital, he gained six ounces. Von Sacken was told appellant and A.B. had cared for the baby, but appellant said she had been hospitalized after child 9's birth and relied on child 3 and 4, who were 11 and 12 years old, to make the baby's bottles.

{¶ 12} Regarding child 9's numerous fractures, Von Sacken asked appellant how the injuries happened, and appellant gave several different possibilities. At first,

5.

appellant said A.B. had big, strong hands and occasionally A.B. swaddles the baby tightly. Appellant described how sometimes when A.B. grabbed her arm he would leave bruises, not realizing his strength. In addition, appellant surmised a young woman, Au.H., who had been living with the family and taking care of child 9, could have caused the injuries. Appellant also said she had given child 9 a bath and he slipped so she grabbed his arm. Appellant took child 9 to the hospital because the baby had been coughing for three or four days.

{¶ 13} Von Sacken spoke with child 3 and 4 about child 9's injuries. Both said they did not know how the baby was hurt, but they talked about physical abuse in the home since A.B. had been there. It was reported both child 3 and 4 were fearful of A.B.

{¶ 14} Von Sacken testified at the outset of the case permanent custody, not reunification, was recommended for several reasons: child 9's numerous injuries by an unknown perpetrator during a time that both parents were in the house; child 9's failure to thrive for which both parents were responsible; and, the family's history with appellee since 2001, which included four cases where services were offered to the family. One case involved the police bringing some of the children to appellee because they were unsupervised and in the street. In another case, the children would not talk to appellee's staff or if the children did talk, they were coached. Von Sacken stated she did not know what additional services could be offered to the family to rectify their problems. Von Sacken further explained appellant and A.B. provided the H. family to appellee so the children could be placed there.

6.

**Caseworker Charmaine West**

{¶ 15} West, an assessment caseworker for appellee, testified she started working with the family in August 2015. West received a referral that the H. family wanted appellant's three youngest children removed from the home because the older children were hitting child 8 and calling her names because she reminded them of A.B. Following a meeting and visit, it was agreed the children would stay in the H. family home, with additional services. At that time, child 3, 4, 5 and 6 were not visiting with appellant.

{¶ 16} In October 2015, West received a second referral because the children were not being taken to their medical appointments. The children remained with the H. family, and medical appointments for the children were made and kept. About two weeks later, another referral was received, for physical abuse. It was reported that child 5 had a black eye because child 4 hit him with a plastic spoon, child 3 was allowed to spank child 5 with a belt, as child 3 had done at appellant's home, and child 6 hit child 5. The children remained with the H. family.

{¶ 17} West testified the last referral reported that child 3 had only had three pairs of underwear and the children smelled. The next day, West went to the H. family home to ask about the underwear issue and find out where the children slept. West was taken to the basement and saw two cinder blocks with a board across them for child 4's bed, a mattress in the corner, garbage bags everywhere and clothes everywhere. West said the strong urine smell was so bad she "dipped in and dipped back out." West was told child

7.

5 and 6 would just stand up and urinate wherever. The children were removed from the H. family home.

{¶ 18} Regarding child 2, West had heard child 2 was back in Toledo from Alabama and asked appellant if she knew where child 2 was, but appellant would not say.

{¶ 19} West testified child 3 and 4 were fearful of A.B. Child 4 said A.B. tied a rope in knots and hit him with it. One time, A.B. grabbed child 4 by the neck and pushed him up against the wall, causing a dent in the wall. Child 4 stated A.B. would beat the children with his fists.

**Caseworker Jennifer Gale**

{¶ 20} Gale, a caseworker for appellee, testified she started worked with appellant's family in late October, early November 2015, when the children were removed from the H. family home. Gale said there was no acknowledgement or admission by appellant or A.B. that child 9 was physically abused or that he was not gaining weight. Appellant explained to Gale that she had been hospitalized and in a coma, which "[b]asically, kind of removed her from the scenario" of taking care of child 9.

{¶ 21} Aside from the nonverbal children, Gale had conversations with the children at different times about physical abuse which had taken place while they were under the care of appellant and A.B. Child 4 said he and his siblings were beaten by A.B. with a rope and a belt, and he did not want to visit with appellant for a time or acknowledge that appellant was his mother. Child 6 stated he and his siblings were

8.

beaten and not treated right by A.B., and he did not want to visit with appellant. Child 5 reported there was physical abuse in appellant's house with A.B. and he did not feel safe there. For a time, child 5 did not want to visit with appellant.

{¶ 22} Gale said there was also a time that child 3 did not acknowledge appellant was her mother and she did not want to visit appellant. Child 3 said she would never forgive appellant for letting adult men upstairs into child 2 and 3's room to do sexual things to them. Child 3 told appellant about what happened with the men, but appellant did not believe her. Child 3 later recanted what she said.

{¶ 23} Gale testified appellant and A.B. identified the H. family as a potential placement for the children, as appellant felt the H. family was very good to the children and appellant was "very happy that Children Services had removed her kids from the home." Later, however, appellant voiced concerns to Gale regarding the H. family. Gale worked with some of appellant's children, in October 2015, when those children were being removed from the H. family home for being neglected.

{¶ 24} Gale said child 4 told her he was physically and sexually abused while with the H. family. However, after child 4 was removed from the H. family home and placed in a foster home, he ran away from the foster home and returned to the H. family. Child 4 was then returned to the foster home, but was later removed from the foster home because he was in a physical fight with child 6. Gale recounted child 4 was diagnosed with ODD (oppositional defiant disorder) and adjustment disorder, and he was prescribed medication and saw a therapist. Child 4 was also assessed at Rescue Crisis Center.

9.

**{¶ 25}** Gale testified child 3 was placed in a foster home with child 2, but child 3 ran away because child 2 was going to beat her up. Child 3 was diagnosed with ADHD (attention deficit hyperactivity disorder), ODD and depression and was prescribed medication.

**{¶ 26}** In late November 2015, Gale visited child 2 in the foster home. Child 2 was threatening to bomb the home and beat up child 3. The police were called and child 2 was taken to Kobacker, an in-patient psychiatric facility, where she stayed five or six days. Child 2 was diagnosed with mood disorder and depression and prescribed medication. Child 2 said child 3 was lying when she said appellant would let men upstairs into their room to do sexual things.

**{¶ 27}** Gale testified child 5 was diagnosed with ADHD, ODD and PTSD (post-traumatic stress disorder). Child 5 was also assessed at Rescue Crisis Center.

**{¶ 28}** Gale spoke with F.M., the father of child 6. F.M. is not in a position to raise child 6, but wants his sister to adopt him. F.M. said A.B. put a gun to F.M.'s face, and A.B. is not nice to the kids. F.M. stated "you can't let those kids go back to their mom's house." Child 6 has been placed with his aunt, F.M.'s sister, and she is willing to adopt him.

**{¶ 29}** Gale recalled child 7 has special needs as she is hearing impaired and has a hole in her heart. Child 7 has been diagnosed with PTSD, which stems in part from being beaten up by her siblings while they were with the H. family because she resembled appellant. Child 7's behaviors include pulling out her hair, eyelashes and eyebrows,

10.

hiding food or overeating and hitting her sister. Although child 7 was five years old, she was not potty-trained. At visits with appellant and A.B., Gale described child 7 as obnoxious, running out of the room nonstop and having to be chased by the guards. When Gale saw child 7 at the foster home, the child was calm and would play or sit still.

**Caseworker Marco Quimbaya**

{¶ 30} Quimbaya, a caseworker for appellee, testified he started working with the family in May 2016. He said appellee's recommendation was for child 2 to have a permanent planned living arrangement and for appellee to have legal and permanent custody of the other seven children. During one visit, Quimbaya discussed scratches on child 9's face and neck and under child 8's arm, which child 8 said were from the foster mom, then later said were from appellant and A.B. At another visit, child 7 had a bathroom incident when she went to the bathroom with appellant and urinated on the floor and smeared feces on herself and the bathroom wall. Quimbaya stated the children are at very high risk of physical and emotional abuse with appellant and A.B. since there is an extensive history of physical and emotional abuse referrals.

{¶ 31} Quimbaya spoke with child 2, 3, 4 and 5 and they all stated they want to live with appellant. Quimbaya said child 6 is adjusted and doing fine living with his aunt and the aunt wants to adopt him. Child 6 refuses to visit with appellant. Quimbaya recalled child 5 has special needs, including ADHD and behavioral issues, like being unruly and disrespectful, and child 9 has some developmental delays.

11.

**GAL Emily Richter**

{¶ 32} Richter testified she is a staff attorney for Court Appointed Special Advocate ("CASA") and the GAL appointed to represent appellant's children in both the 2014 and 2015 cases.

{¶ 33} In the 2014 case, Richter said appellee received a referral from the hospital regarding child 9 and the multiple rib fractures he suffered. The children were put in a safety plan out of the home. Child 9 was found to be abused, neglected and dependent and the other six children were dependent and neglected. At first when Richter visited the children at the H. family home, the children were fine and comfortable, although they missed appellant. Over time, child 3, 4, 5 and 6 made disclosures about what occurred at appellant's house, including physical abuse of the children by A.B., and appellant saying she would have A.B. whoop the children into shape. Some of the children talked about being awakened in the middle of the night to clean as a form of punishment, and one child was grabbed by the throat by A.B. and pushed into a wall. Child 4 said he was whipped with a switch by A.B.

{¶ 34} In August 2014, when Richter went to appellant's home to meet with appellant and A.B., she found A.B. was angry and almost aggressive at times, so she decided not to go to appellant's house to meet anymore.

{¶ 35} By the fall of 2014, there were reports the children were not being fed at the H. family home, and were dirty and wearing dirty clothes. Ultimately a permanent plan was established for the seven youngest children and legal custody was awarded to

12.

the H. family in February 2015; this was Richter and appellee's recommendation, and was agreed to by appellant and A.B. At that point, the four older children were in therapy at Zepf Center and were not visiting appellant; only the three youngest children were visiting appellant.

{¶ 36} Richter testified when the children first came into care, many had mental health diagnoses and were on medication. Richter recommended a permanent plan rather than case plan services for appellant and A.B. because they did not acknowledge what had happened to child 9; they believed there was medically something wrong with him despite what all of the medical professionals reported. Richter indicated child 9 has not suffered any broken bones since he was first injured.

{¶ 37} In the 2015 case, Richter testified child 4, 5 and 6 were initially placed together in a foster home, but child 5 "disrupted" shortly after the placement and was removed, so it was just child 4 and 6 in the home. Some months later, child 4 beat up child 6, so child 4 was removed and put in a new placement. In March 2016, child 6 was placed with his paternal aunt.

{¶ 38} Richter stated child 4 refused to visit with appellant for a time, but started visiting appellant again in early 2016. Child 6 has not visited appellant and does not want to visit with her due to the whoopings and abuse that he said occurred in appellant's house. All of the children, except child 5, visited with the H. family after the children were removed from the house, until March or April 2016, when visitation was terminated

13.

due to allegations of physical and sexual abuse which had occurred in the H. family home.

**{¶ 39}** Richter testified child 2, 3 and 4 have repeatedly run away from their foster homes, and all three have had criminal charges in juvenile court.

**{¶ 40}** Richter stated child 5 has had behavioral issues for years and is aggressive, does not listen and swears at everyone. Child 5 had to be placed in special school for his behavior. Child 5 does pretty well for his foster mother, but he is unpredictable. Child 5 wants to go home with appellant and gets very angry when he is told he is not going home with her.

**{¶ 41}** Richter stated the three younger children are placed together and are thriving in their placement. Child 7 is learning sign language and is trying to communicate. Richter was not aware of appellant learning sign language and did not observe appellant using sign language with child 7. During visits with appellant, child 7 vomits because she eats to excess, she hits, kicks, bites and runs around the room without being able to be redirected. These behaviors were not observed in child 7's foster home.

**{¶ 42}** Richter did not interview A.B. with respect to the 2015 case because A.B. was very aggressive with her during the 2014 case, and he did not appear very friendly or wanting to talk with her or listen to what she had to say during the 2015 case, so she elected to avoid confrontation with him. Richter indicated A.B. has a history of assaultive behavior with the children and F.M., child 6's father, and A.B. has been aggressive with most of the caseworkers and difficult to deal with. Richter said A.B. was

14.

charged with assaulting child 2, but the criminal charges were dismissed, in part, because child 2 was in Alabama.

{¶ 43} Richter testified child 6 wants to live with his aunt, and he is thriving there, and child 2, 3, 4 and 5 want to live with appellant. Richter believed the children would not be safe if they were returned to appellant and A.B.'s custody as the children were neglected and physically and emotionally harmed when living at appellant's home. Moreover, appellant and A.B. have not acknowledged a problem despite the family's history with appellee, and they have not taken responsibility for the problems in the home. Richter noted there have been 22 referrals over the years for a multitude of issues including neglect, lack of supervision and physical abuse. Richter's recommendation was for child 2 to have a permanent planned living arrangement and for appellee to have legal and permanent custody of the other seven children.

**Dr. Randall Schlievert**

{¶ 44} Dr. Schlievert, a medical doctor and child abuse medical expert, testified he authored a July 15, 2014 report regarding his evaluation of child 9's case. The doctor reviewed records and x-rays and reached two conclusions: child 9 had multiple fractures due to physical abuse, and failure to thrive.

{¶ 45} Dr. Schlievert testified the fractures included two clavicle fractures, fractures of both humeri and multiple rib fractures, at least four ribs were fractured. All of the fractures showed signs of healing, and a week or two had passed since the fractures of the humeri had occurred. The symptoms for a two-month-old child with multiple

15.

fractures would include pain and discomfort, certainly when the affected areas were moved or touched, crying, fussiness, shallow or rapid breathing and exhaustion from crying. The symptoms would last until healing was advanced, about 10 to 14 days. The doctor opined a reasonable expectation of a response from a parent whose child had these symptoms would be, within 24 hours, to know something was different or wrong and to seek medical attention.

{¶ 46} The doctor noted child 9 was taken to the emergency room with symptoms of cough and congestion and appellant's concern was the baby had pneumonia or a cold or infection. However, the records showed there were no signs the infant was sick, just underweight.

{¶ 47} Dr. Schlievert acknowledged appellant had bariatric surgery in 2010, and noted appellant had a two or more week hospital stay following child 9's birth, including being in a coma for a period of time. The doctor reviewed appellant's medical records to see if there was any relation between the complications appellant suffered after child 9's birth and his injuries, but there was no connection. The doctor noted, with regards to child 9's delivery, that he was a small baby and was born by Cesarean section, so rib fractures occurring during birth would not be likely, and after almost two months, most healing would be on its way to being complete.

{¶ 48} The doctor testified child 9's x-rays showed normal bone health, and there was no overt evidence of brittle bone disease. Moreover, rib fractures are not characteristic of osteogenesis imperfecta ("OI"). If the child had OI, fractures would be

16.

more likely when the child is mobile. However, since the child had no further fractures in the two years since he was removed from the parents' home, this rules out any disease.

{¶ 49} The doctor noted failure to thrive is devastating because of the impact to the infant's brain growth and development especially in the first year or life. The doctor testified a healthy infant normally gains one ounce a day for at least the first two or three months, and will double its weight by five to six months. The doctor observed child 9 had a normal four week check-up, but had only gained 10 ounces when he was seven or eight weeks old. Then, when hospitalized for a few days, he gained two ounces a day, which ruled out a feeding problem or medical problem. Child 9's failure to thrive was likely due to insufficient calories. Dr. Schlievert stated the concern was child 9 was not getting fed enough at home and this would be an ongoing safety issue.

{¶ 50} Dr. Schlievert recommended child 9 be provided a protective placement in a safe environment to prevent further injury. The doctor had concerns if the parents think a medical condition caused the injuries, because in order to ensure injuries do not happen again, the first step is to acknowledge a problem.

**Ronney Braziel**

{¶ 51} Braziel is a social worker who worked at the Zepf Center. Braziel testified from July 2010 to July 2012, he worked with four of appellant's children, child 2, 3, 4 and 5. Then, from September 2013 to 2014, child 6 was added to Braziel's caseload. Braziel did home-based therapy with appellant's family.

17.

{¶ 52} Braziel testified from 2010 to 2012, appellant was not married and A.B. was not in the home, so when Braziel went to appellant's home, he worked with appellant on her parenting skills to make her a more proactive parent, and he addressed the children's individual mental health issues. Initially, appellant had relatively poor parenting skills because she was a hands-off parent who did not lead by example and she had very little contact with the children's school. Two years later, appellant's general parenting skills improved dramatically and she was a really proactive parent who was regularly at school, would check the children's grades, and at home she would show the children how to do certain activities. When Braziel first started working with the family, cleanliness of the house was an issue. However, by the second year, the house was a major priority for appellant and she was a lot more organized.

{¶ 53} From September 2013 to about August 2014, Braziel worked with the family, at first at appellant's home, then after the children were removed from appellant's home, at the H. family home. Braziel observed the older children took care of the younger kids when the children lived with appellant. Braziel never saw or heard of any abuse or neglect, although the children often fought with each other and did not always listen to directions at home and at school. Child 3 reported that she fought all of the time with child 4 and she was annoyed with child 5 because he hit her all of the time.

{¶ 54} Braziel was questioned about the children's mental health diagnoses and behaviors, including that child 3 was depressed, had ADHD and ODD, lied, ignored appellant and did not take responsibility for her actions. Child 2 had major depressed

18.

disorder, psychotic features, ADHD and ODD, and child 5 had severe mental health issues, was diagnosed with ADHD and ODD and missed a lot of school. Braziel testified child 5 was prescribed medication, but in 2010, he did not consistently take the medicine. After the first year, he was taking his meds and got a lot better and did better in school. Braziel was shown progress notes he authored from June 2014 which stated child 5 made an unsolicited comment that A.B. had been hitting him regularly for no reason. Braziel testified he did not remember that specific incident.

**Appellant**

{¶ 55} Appellant testified after she was born, she was raised by her paternal grandmother until she was three years old. Appellant then went to live with her mother, so her mother could receive the check that came with appellant. Appellant was molested by her mother's boyfriend from the age of three until seven. Appellant's sisters were also molested. Appellant's mother knew of the abuse but did not stop it. Appellant told her father and grandmother about the abuse, then appellee got involved and removed appellant and her siblings from the home. Appellant was placed with her grandmother, then her aunt, then foster care. When appellant was about nine years old, she went back to live with her mother. When she was 12 years old, appellant's mother "lost her mind," so appellant was left to fend for herself and her two younger siblings. Appellant's mother allowed numerous people to move into the house, including S., and appellant became pregnant by S. Appellant's mother left, so appellant raised her siblings until the utilities were turned off. Appellee became involved; appellant went to live with her grandmother

19.

and the siblings were placed in foster homes.  S. was sent to prison for two and one-half years.

{¶ 56} Appellant gave birth to child 1 when she was 12 years old.  After about nine months, appellant and child 1 were placed in a foster home because her grandmother was no longer able to care for them.  When child 1 was two and one-half years old, he was removed from appellant's care and her parental rights were terminated.  S. was released from prison and appellant became pregnant again by him, although she had a miscarriage.  Later, appellant became pregnant again by S. and gave birth to child 2.  At the hospital, child 2 was removed from appellant's care and was placed with appellant's cousin, where child 2 was sexually abused.  When child 2 was one and one-half years old, she was returned to appellant's care.

{¶ 57} Appellant then gave birth to child 3, moved into her first apartment and had child 4.  On appellant's 20th birthday, S. committed suicide.

{¶ 58} When appellant was 21 years old, she bought the house where she still lives today. Appellant had more children.  Appellant also took GED classes and earned her GED.

{¶ 59} In 2010, appellant had a gastric bypass.  When she became pregnant with child 8, it was a high risk pregnancy and appellant had to have blood transfusions and vitamin shots.  Then, appellant became pregnant with child 9, and this was also a high risk pregnancy and appellant had to have blood transfusions, which made her sick.  A Cesarean section was scheduled for May 30, 2014, but child 9 was born about two weeks

20.

early. Although a C-section was performed, appellant had complications and suffered a stroke; she was on life support and in a coma for three weeks. Thereafter, appellant had to learn how to walk and talk again. While appellant was in the hospital, child 9 was cared for by Au.H., a 19 year old who appellant had taken into her home at the request of the pastor's wife. Appellant knew Au.H. had punched the pastor's daughter in the stomach when they were at church the weekend before child 9 was born, so appellant told Au.H. never to put her hands on the children. After appellant was released from the hospital, Au.H. still cared for the baby because appellant was recuperating and A.B. had pulmonary disease and could not walk.

{¶ 60} On June 21, 2014, child 4 told appellant that Au.H. was hitting the children while appellant was in a coma, and Au.H. left bruises on child 5 and had kicked child 4, 5 and 6. Appellant asked the children and they all confirmed that Au.H. had hit them, so appellant evicted Au.H.

{¶ 61} Appellant acknowledged the children fought all of the time with each other when they lived with her and even injured each other on occasion. Appellant also admitted when child 3 was young, she was touched inappropriately by child 2.

{¶ 62} After the children were removed from appellant's home and living with the H. family, appellant made it to every visit with her children. She also took parenting classes and anger management classes as well as a class on how to run a business.

21.

**{¶ 63}** Regarding A.B., appellant testified she married him in August 2014, after they had dated for three years. A.B.'s method of disciplining the children was to lecture them for hours. Appellant never saw A.B. physically or emotionally abuse the children.

**{¶ 64}** When asked about the testimony with respect to the children's diagnoses, special needs and mental health issues, appellant said she agreed with some of the testimony. Appellant acknowledged if medication was prescribed for the children, they should take the medicine. Appellant stated the children require family counseling due to what happened to them when they lived with the H. family.

**{¶ 65}** Appellant did not know how child 9 was injured, as she did not even know he was hurt. She took the baby to the hospital because he was coughing and wheezing. Appellant does not believe child 9 is an abused child.

**{¶ 66}** Appellant acknowledged that child 2, 3 and 4 ran away from their foster homes, had been arrested and were in the juvenile detention center.

**{¶ 67}** Appellant requested child 2, 3, 4 and 5 be returned to her immediately and the four younger children remain temporarily with appellee, but then be returned to her.

### Trial Court's Decision

**{¶ 68}** In its October 17, 2016 judgment entry, the court found appellant's youngest seven children were dependent and neglected, and S.S. was dependent. The court further found, by clear and convincing evidence under R.C. 2151.353(A)(4), that the five youngest children could not be placed with either parent within a reasonable time, and pursuant to R.C. 2151.414(D)(1), it was in the children's best interest to grant

22.

permanent custody of them to appellee. The court further found, under R.C. 2151.414(E)(4), that overwhelming evidence proves appellant and A.B. are unwilling to provide a safe, stable, healthy and adequate permanent home for the five youngest children.

{¶ 69} The court further found, under R.C. 2151.414(E)(15) and (16), that the parents have allowed the children to suffer neglect, and the likelihood of recurrence of the abuse or neglect makes the children's placement with the parents a threat to the children's safety. The court found the severity of child 9's injuries, the ignorance or unwillingness of parents to seek medical treatment within a reasonable time and the parents' denial of the severity and cause of child 9's injuries provides more than sufficient clear and convincing evidence to terminate the parental rights for the five youngest children. The court further found it was in the best interest of child 2, 3 and 4 to be returned to appellant and A.B, with appellee holding protective supervision. The court's reasoning for this finding was based on: these children were "on the run from foster care" during much of the case; they all expressed a desire to live with appellant; they were old enough to report any abuse that might occur at appellant's house; and, they were all in need of a legally secure permanent placement, and it was more likely to be achieved by placing these children with appellant.

**Appellant's First Assignment of Error**

{¶ 70} Appellant argues the trial court's finding that the children could not be returned to her within a reasonable time was not supported by clear and convincing

23.

evidence. Appellant contends after the children were removed from the home, no case plan services were offered to her or A.B. because appellee claimed a reunification plan would be futile. Appellant asserts appellee believes appellant and A.B. must admit they injured child 9 even though appellee is unable to prove appellant or A.B. was responsible for the baby's injuries.

{¶ 71} Appellant submits she and A.B. took parenting and anger management classes through a reverend, but appellee ignored this because the reverend does not conduct the classes the way appellee or the GAL wants. Appellant maintains the court's finding under R.C. 2151.414(E)(4) has no basis in fact, and there is no credible evidence that appellant abused the children, as the court found under R.C. 2151.414(E)(15). Appellant observes the disclosures that appellant allowed the children to be sexually and physically abused were either recanted or denied.

{¶ 72} Appellee counters the record contains more than sufficient evidence to support the trial court's decision to award permanent custody of the five youngest children to appellee. Appellee contends the evidence shows a case plan for appellant would have proved futile because of appellant's ignorance of child 9's injuries, her failure to seek emergency medical care for him and her refusal to acknowledge responsibility for his failure to thrive.

{¶ 73} The trial court found R.C. 2151.414(E)(4), (15) and (16) applied in this case. R.C. 2151.414(E) states in pertinent part:

24.

In determining at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence. If the court determines, by clear and convincing evidence, at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:

* * *

(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child;

* * *

(15) The parent has committed abuse as described in section 2151.031 of the Revised Code against the child or caused or allowed the child to suffer neglect as described in section 2151.03 of the Revised Code, and the court determines that the seriousness, nature, or likelihood of

recurrence of the abuse or neglect makes the child's placement with the child's parent a threat to the child's safety.

(16) Any other factor the court considers relevant.

{¶ 74} Clear and convincing evidence requires proof which "produce[s] in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus.

{¶ 75} Here, as to R.C. 2151.414(E)(4), the trial court found overwhelming evidence proved that appellant and A.B. are unwilling to provide a safe, stable, healthy, adequate permanent home for the children. The court referenced Dr. Schlievert's testimony regarding child 9's injuries and suffering, that the injuries were the result of child abuse and the need to place the child in a safe environment. The court also found appellant and A.B.'s failure to seek medical care for child 9 within a reasonable time was inconceivable.

{¶ 76} Concerning R.C. 2151.414(E)(15) and (16), the court found appellant and A.B. allowed the children to suffer neglect of a serious nature, and the likelihood of recurrence makes the children's placement with the parents a threat to the children's safety given the children's tender years. The court emphasized child 9's severe injuries and lack of medical attention to those injuries within a reasonable time as well as the parents' denial of the severity and cause of the injuries. The court also indicated no

26.

reasonable explanation was offered by appellant and A.B. for the failure of child 9 to receive proper nutrition and food.

{¶ 77} Based on our extensive review of the record, the trial court's finding that appellant's five youngest children cannot and should not be placed with either parent within a reasonable time is supported by clear and convincing evidence. Accordingly, appellant's first assignment of error is found not-well taken.

<strong>Second Assignment of Error</strong>

{¶ 78} In her second assignment of error, appellant argues appellee failed to provide reasonable efforts to reunify the family, claiming it was futile to offer her and A.B. case plan services.

{¶ 79} Appellee counters R.C. 2151.412 does not require the juvenile court to order a reunification plan when making an order of disposition under R.C. 2151.353(A)(4), nor is the children services agency required to establish a case plan.

**Case Plan/Reunification Plan**

{¶ 80} R.C. 2151.412 requires the children services agency to prepare and maintain a case plan after an award of temporary custody has been given to the agency, however, "R.C. 2151.412 does not require a juvenile court to order a reunification plan when it makes a dispositional order pursuant to R.C. 2151.353(A)(4)." *In re Baby Girl Baxter*, 17 Ohio St.3d 229, 479 N.E.2d 257 (1985), paragraph two of the syllabus. We have also held where a children services agency seeks original permanent custody of children, pursuant to R.C. 2151.353(A)(4), the agency is not required to prepare a case

27.

plan. *In re Misty B.*, 6th Dist. Lucas No. L-98-1431, 1999 Ohio App. LEXIS 4314 (Sept. 17, 1999); *In re R.B.*, 6th Dist. Lucas No. L-09-1274, 2010-Ohio-4710.

{¶ 81} R.C. 2151.353(A) provides in pertinent part:

If a child is adjudicated an abused, neglected, or dependent child, the court may make any of the following orders of disposition:

* * *

(4) Commit the child to the permanent custody of a public children services agency or private child placing agency, if the court determines in accordance with division (E) of section 2151.414 of the Revised Code that the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent and determines in accordance with division (D)(1) of section 2151.414 of the Revised Code that the permanent commitment is in the best interest of the child.

{¶ 82} *In re Misty B.*, we held

It is clear that LCCS was proceeding in this case pursuant to R.C. 2151.353(A)(4). The children had not previously been adjudicated dependent, neglected or abused and the agency was seeking original permanent custody, not a change from temporary to permanent custody. A case plan therefore was not required under these circumstances and the trial court acted properly.

28.

{¶ 83} Here, appellee filed its complaint in dependence and neglect: permanent custody and motion for shelter care hearing on November 4, 2015. In the complaint, appellee sought permanent custody of appellant's eight children. The trial court, in its decision, also recognized that appellee filed a complaint in permanent custody. The court expressly found "by clear and convincing evidence under R.C. 2151.353(A)(4) * * * [appellant's youngest five children] cannot and should not be placed with either parent within a reasonable time." We therefore find appellee was clearly proceeding pursuant to R.C. 2151.353(A)(4). *See In re Misty B*; *In re R.B.* Thus, appellee did not have to prepare a case plan for appellant. Likewise, it was not necessary for the trial court to order a reunification plan. *See In re Baby Girl Baxter*.

**Reasonable Efforts to Reunify**

{¶ 84} "[E]xcept for some narrowly defined statutory exceptions, the state must make reasonable efforts to reunify the family before terminating parental rights." *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 62 N.E.2d 816, ¶ 4. R.C. 2151.419 sets forth how the court determines whether the agency made reasonable efforts to return the child to the home. R.C. 2151.419(A) states in pertinent part:

> (1) Except as provided in division (A)(2) of this section, at any hearing held pursuant to section * * * 2151.353 of the Revised Code at which the court * * * continues the removal of a child from the child's home, the court shall determine whether the public children services agency * * * that filed the complaint in the case * * * has made reasonable efforts

to * * * make it possible for the child to return safely home. The agency shall have the burden of proving that it has made those reasonable efforts. If the agency removed the child from home during an emergency in which the child could not safely remain at home and the agency did not have prior contact with the child, the court is not prohibited, solely because the agency did not make reasonable efforts during the emergency to prevent the removal of the child, from determining that the agency made those reasonable efforts. In determining whether reasonable efforts were made, the child's health and safety shall be paramount.

{¶ 85} Here, the trial court found appellee made reasonable efforts to avoid the removal of the children from the home, although services were not provided due to the urgent nature of the removal. The court further found appellee made reasonable efforts to implement and finalize a permanent plan by providing mental health treatment for the children, visitation for the parents and safe placements for the children. The court further found appellee "made reasonable efforts by identifying potential adoptive homes when the children's best interest required an alternative permanent plan to returning the children to a dangerous environment." The court further found appellee made reasonable efforts by "identifying an alternative permanent plan and potential adoptive home" for child 5, 6, 7, 8 and 9.

{¶ 86} The record shows appellant's children were removed from the home on an emergency basis, due to serious concerns about the health and safety of the children due

30.

to child 9's injuries and failure to thrive diagnosis. Following the removal of the children, neither appellant nor A.B. took responsibility for child 9's injuries and failure to thrive, and appellant did not admit child 9 was an abused child. Since appellee sought permanent custody of the children as an initial disposition and there was a threat of additional serious harm to child 9 and his siblings due to appellant and A.B.'s failure to acknowledge the problems in the home, it was reasonable for appellee to seek safe, alternative housing for the children and not provide any type of reunification plan. We find, considering the circumstances, with the children's safety and health as the paramount concern, appellee did use reasonable efforts to reunite appellant with her children. In light of the foregoing, appellant's second assignment of error is not well-taken.

**Child 5's Issues on Appeal**

{¶ 87} Child 5 asks: Did appellee make reasonable efforts to reunify the family when no services were provided to appellant, yet some of her children were returned to her custody while custody of others was awarded to appellee? Did the court err by awarding custody of child 5 to appellee when the child expressed a clear preference to be placed with his older siblings in appellant's custody? Does child 5 have standing to appeal?

{¶ 88} Child 5 argues this court should find if no case plan services are required to return some of appellant's children, then no case plan services are required to return him, a ten-year-old child who expressed his preference to live with his mother.

**Standing**

{¶ 89} A minor child, who is the subject of a permanent custody proceeding, has standing to appeal a trial court's judgment granting permanent custody to a children services agency where the minor's interest in being cared for by his biological parent has been adversely affected by the court's judgment. *In re Z.H.*, 1st Dist. Hamilton Nos. C-150301, C-150305, 2015-Ohio-3209, ¶ 5. Accordingly, child 5 does have standing to appeal.

**Issues**

{¶ 90} We have already addressed child 5's first issue with respect to reasonable efforts to reunify the family in appellant's second assignment of error. Thus, we will now consider the second issue regarding his wish to be placed with his mother.

{¶ 91} R.C. 2151.414(D)(1) directs the trial court to consider all relevant factors when determining the best interest of the child; thus, the preference of the child is but one factor for the court to consider. Moreover, R.C. 2151.353(A)(4) requires this court to affirm the court's custody determination if the evidence supports the court's finding that granting permanent custody to appellee is in the child's best interest. The trial court's decision in a permanent custody case will not be reversed on appeal unless it is against the manifest weight of the evidence. *In re A.H.*, 6th Dist. Lucas No. L-11-1057, 2011-Ohio-4857, ¶ 11, citing *In re Andy-Jones*, 10th Dist. Franklin Nos. 03AP-1167 and 03AP-1231, 2004-Ohio-3312, ¶ 28. The factual findings of the trial court are presumed correct since, as the trier of fact, the court is in the best position to weigh the evidence

32.

and evaluate the witnesses' testimony. *In re Brown*, 98 Ohio App.3d 337, 342, 648 N.E.2d 576 (3d Dist.1994). Furthermore, "[e]very reasonable presumption must be made in favor of the judgment and the findings of facts [of the trial court]." *Karches v. Cincinnati*, 38 Ohio St.3d 12, 19, 526 N.E.2d 1350 (1988). A judgment supported by some competent, credible evidence going to all essential elements of the case is not against the manifest weight of the evidence. *Id.*; *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279, 376 N.E.2d 578 (1978), syllabus.

{¶ 92} R.C. 2151.414(D) provides:

(1) In determining the best interest of a child at a hearing held * * * for the purposes of division (A)(4) or (5) of section 2151.353 * * * of the Revised Code, the court shall consider all relevant factors, including, but not limited to, the following:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child * * *;

33.

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

{¶ 93} Here, with respect to child 5, the trial court found an order of permanent custody to appellee was in his best interest based on an analysis under R.C. 2151.414(D)(1). The court considered child 5's need for a legally secure permanent placement, and found the child cannot achieve permanency without an award of permanent custody. The court observed child 5 has special needs and requires an environment where his caregivers will follow through with regard to his mental, emotional and behavioral services in a reasonable period of time, which appellant is not capable of doing. The court noted child 5 requires an immense amount of intervention due to his behavioral problems and mental health diagnoses. The court recognized child 5 was initially placed with his siblings, but his challenging behavioral issues caused him to be moved more than once, such that child 5 is not placed with his siblings. The court found appellant is not capable of meeting child 5's needs "as demonstrated by the long-standing turmoil he was exposed to in his mother's home." The court noted child 5 told Braziel that A.B. hit him and the other children for no reason. While the court acknowledged child 5 expressed that he did wish to return to appellant's care, the court found that would be contrary to his best interest.

34.

**{¶ 94}** The court further noted the GAL, following an independent investigation, opined that permanent custody was in child 5's best interest. Likewise, the caseworkers recommended permanent custody as being in child 5's best interest.

**{¶ 95}** Based on our review of the record, we find competent, credible evidence exists to support the trial court's findings under R.C. 2151.414(D)(1) to establish a firm belief or conviction that an award of permanent custody to appellee is in the best interest of child 5, despite his contrary wishes. We therefore conclude the trial court's determination to award permanent custody of child 5 to appellee is not against the manifest weight of the evidence. Accordingly, child 5's issues are not well-taken.

**{¶ 96}** On consideration whereof, the judgment of the Lucas County Court of Common Pleas, Juvenile Division, is affirmed. Appellant and child 5 are ordered to equally share the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J. _____

Arlene Singer, J. _____

James D. Jensen, P.J. _____
CONCUR.

_____
JUDGE

_____
JUDGE

_____
JUDGE